**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| OLD BALTIMORE PIKE APOTHECARY, INC., T/A SOUTHERN CHESTER COUNTY PHARMACY; and SMITH'S PHARMACY II, INC., D/B/A SMITH'S PHARMACY, individually and on behalf of all others similarly situated, | Case No. _____ |
| Plaintiffs, | **CLASS ACTION COMPLAINT** **JURY TRIAL DEMANDED** |
| v. | |
| GOODRX HOLDINGS, INC., CVS CAREMARK CORPORATION, EXPRESS SCRIPTS HOLDING COMPANY, MEDIMPACT HEALTHCARE SYSTEMS, INC., and NAVITUS HEALTH SOLUTIONS, LLC, | |
| Defendants. | |

Plaintiffs Old Baltimore Pike Apothecary, Inc., t/a Southern Chester County Pharmacy and Smith's Pharmacy II, Inc., d/b/a Smith's Pharmacy (together "Plaintiffs"), individually and on behalf of all others similarly situated (the "Class," as defined below), upon personal knowledge as to the facts pertaining to themselves and upon information and belief as to all other matters, and based on the investigation of counsel, brings this class action complaint to recover treble damages, injunctive relief, and other relief as appropriate, based on Defendants' violations of federal antitrust laws.

## I.    NATURE OF THE ACTION

1.    This action arises from Defendants' conspiracy to fix prices paid by pharmacy benefit managers ("PBMs") to pharmacies for reimbursement of prescription drug claims. Defendants are GoodRx Holdings, Inc. ("GoodRx"), a prescription discount card aggregator, and

four of the largest PBMs in the United States: CVS Caremark Corporation ("Caremark"),

Express Scripts Holding Company ("Express Scripts"), MedImpact Healthcare Systems, Inc.

("MedImpact"), and Navitus Health Solutions, LLC ("Navitus") (Caremark, Express Scripts,

MedImpact and Navitus are referred to collectively as the "PBM Defendants") (GoodRx and the

PBM Defendants are referred to collectively as "Defendants").

2.      The PBM Defendants operate in a highly concentrated market. Defendants

Caremark and Express Scripts together process well over half of all the prescriptions filled in the

United States. These two PBMs, plus Optum Rx (the "Big 3" PBMs), process more than 80

percent, and the Big 6 PBMs (the Big 3, plus Humana, Prime Therapeutics, and Defendant

MedImpact) process more than 95 percent.

3.      Over the past few decades, PBMs, including the PBM Defendants, have vertically

integrated themselves with pharmacies, health insurers, health care providers, drug private

labelers, and various other entities at different points in the distribution chain for prescription

drugs. The resulting behemoths have vast market power over prescription drug access and

pricing in the United States. Each of the PBMs Defendants is a wholly owned subsidiary of a

healthcare conglomerate that also owns mail-order, specialty, and/or retail pharmacies, large

health insurance companies, and other players in the market for prescription dispensing services.

4.      The PBM Defendants exert their market power by employing various

anticompetitive tactics to restrain competition in the prescription drug dispensing market, forcing

independent pharmacies out of business and thereby increasing the market share of the PBMs'

affiliated pharmacies. Among these tactics is a recent scheme devised by Defendants to (i) share

real time pricing data with one another using GoodRx as a clearinghouse, and (ii) allocate

transactions to one another in order to maximize the number of claims processed using prescription discount cards.

5.      Each of the PBM Defendants has created and maintained prescription discount card programs. Historically, prescription discount cards provided an option for people without insurance coverage, or whose insurance did not cover a certain prescription, to obtain affordable prescriptions. Prior to Defendants' scheme, if a PBM offered a discount card with a better price than the patient's out-of-pocket cost under their insurance plan, the patient could opt to use the discount card instead of insurance, but the cost would not be applied to the patient's deductible. PBMs charge a fee to the pharmacy on every discount card transaction, and do not reimburse the pharmacy, leaving the discounted price paid by the patient (minus the PBM fee) as the only revenue to the pharmacy. As a result, pharmacies often lose money on discount card transactions, but initially agreed to honor them to foster customer loyalty and bring traffic into their stores. However, as PBMs amassed significant market power, accepting a PBM's discount card has become a requirement for pharmacies to be in the PBM's network and fill prescriptions covered by that PBM.

6.      GoodRx launched in 2011 as a prescription discount card aggregator. GoodRx uses its proprietary software to scan pharmacy networks to collect, analyze, and aggregate prices offered by various PBMs under their discount card programs. Consumers can check GoodRx's website or app to see if any PBMs offer a discount card with a price lower than the consumer's out-of-pocket cost under their health insurance. If so, the consumer can choose to process the prescription through the PBM offering the discount card, instead of the PBM that manages their prescription benefits. GoodRx received a portion of the fee paid by the pharmacy for every discount card transaction it generates.

7.      However, in 2023, GoodRx announced new partnerships with each of the PBM Defendants that transform the role of discount cards in the prescription drug market and stand to drastically increase the number of prescriptions processed through discount cards. The partnerships create a new process that occurs automatically without patients' knowledge or consent when they fill a prescription covered by one of the PBM Defendants. Upon receiving a prescription for an insured patient (or "plan member"), the patient's PBM uses GoodRx's software to determine if another PBM's discount program offers a lower price than what the patient would otherwise pay out of pocket under their insurance coverage or under the discount card program of the patient's PBM. If so, the patient's PBM reroutes the transaction to the PBM offering the lowest discounted price and applies that price to the patient's deductible. The fee paid by the pharmacy for the discount card transaction is then split among the patient's PBM, the PBM that processed the transaction, and GoodRx. Because there is no third-party payer reimbursing the pharmacy as in a typical insurance transaction, the revenue obtained by the pharmacy, GoodRx, and the PBM all comes out of the retail price the patient pays at the pharmacy.

8.      Thus, PBMs collect a portion of the patient's payment at the point of sale for each discount card transaction they process without reimbursing the pharmacy, unlike in regular insurance transactions. As a result, discount card transactions are more profitable than regular insurance transactions for generic drugs. By routing a larger share of prescription drug transactions through discount cards, PBMs are claiming a larger share of the payments for prescription drugs, leaving pharmacies with even less revenue to maintain the viability of their businesses. For many independent pharmacies, which do not have affiliated PBMs to make up

for shortfalls in pharmacy revenue, these anticompetitive partnerships will be the final nail in coffin.

9.     The GoodRx-PBM "partnerships" are in fact price fixing agreements that enable PBMs to allocate discount card transactions to one another in real time, allowing PBMs to maximize the fees they collect from pharmacies and minimize the reimbursement they provide. The partnerships dramatically increase the portion of prescriptions processed through discount cards, instead of through regular insurance transactions, leading to greater losses for independent pharmacies.

10.    As a direct result of the conduct described herein, pharmacies were injured by receiving decreased reimbursement for dispensing generic prescription drugs and paying increased fees to PBMs resulting from discount card transactions. This has contributed to the closure of hundreds of independent pharmacies, thus lessening competition in the prescription drug dispensing market. And in the end, consumers will suffer as these restraints on competition lead to fewer pharmacy choices, lower quality services, and higher healthcare costs.

## II.    JURISDICTION AND VENUE

11.    Plaintiffs bring the antitrust class action lawsuit pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15(a) and 26), to (i) recover treble damages and the costs of suit, including reasonable attorneys' fees, for the injuries sustained by Plaintiffs and members of the Class; (ii) enjoin Defendants' anticompetitive conduct; and (iii) for other such relief as is afforded under the laws of the United States for Defendants' violations of Section 1 of the Sherman Act (15 U.S.C. § 1).

12.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337(a), as this action arises under Section 1 of the Sherman Act (15 U.S.C. § 1), and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15(a) and 26).

13.     Venue is proper under Section 12 of the Clayton Act (15 U.S.C. § 22) because Defendants transact business in this District, and a substantial part of the events giving rise to Plaintiffs' claims occurred in this District, including the provision of prescription drug dispensing services and the use of GoodRx's discount card programs in this District.

14.     This Court has personal jurisdiction over Defendants because, among other things, they either (1) transacted business throughout the United States, including this District, (2) have substantial contacts within the United States, including in this District, and/or (3) are engaged in an illegal anticompetitive scheme that was directed at, and had the intended effect of causing injury to, persons residing in, located in, and doing business in the United States, including in this District.

15.     The activities of Defendants and their co-conspirators, as described herein, were within the flow of, were intended to, and did have direct, substantial, and reasonably foreseeable effects on the interstate commerce of the United States, including this District.

16.     During the Relevant Periods (defined below), Defendants provided services in a continuous and uninterrupted flow of interstate commerce among the several states.

17.     This action also seeks to secure injunctive relief against Defendants to prevent them from further violations of Section 1 the Sherman Act as hereinafter alleged.

18.     No other forum would be more convenient for the parties and witnesses to litigate this case.

### III.   THE PARTIES

19.     Plaintiff Old Baltimore Pike Apothecary, Inc., t/a Southern Chester County Pharmacy is a corporation organized under the laws of Pennsylvania with its principal place of business located at 1011 West Baltimore Pike, Suites 109 and 110, in West Grove, Pennsylvania. Southern Chester County Pharmacy is a locally-owned community pharmacy in the Borough of

West Grove, a community of several thousand residents covering slightly more than half of a square mile in Southeastern Pennsylvania. Southern Chester County Pharmacy has been serving the West Grove community for 42 years, and as of January 2024, Southern Chester County Pharmacy was ranked #1 in customer satisfaction among chain drug store pharmacies for 12 of the last 14 years. Currently, in addition to offering traditional pharmacy services, Southern Chester County Pharmacy regularly provides free health and wellness educational resources to the community through its active social media presence and also provides a telehealth option to ensure its services are accessible. Southern Chester County Pharmacy received lower reimbursements for dispensing generic prescription drugs and/or paid increased fees to PBMs resulting from discount card transactions as a result of transactions with one or more Defendants.

20.      Plaintiff Smith's Pharmacy II, Inc., d/b/a Smith's Pharmacy is a corporation organized under the laws of Pennsylvania with its principal place of business located at 841 E. Hunting Park Avenue, Philadelphia, Pennsylvania. About a mile down the street, at 133 West Hunting Park Avenue, Suite 200, Philadelphia, Pennsylvania, Smith's has a second store that is separately incorporated as Smith's Pharmacy III, Inc. Smith's is a locally owned community pharmacy serving a predominantly low-income community of color in Northeastern Philadelphia. David Smith has served as President of Smith's at all relevant times, providing vital services to the community for the last twenty years. Smith's received lower reimbursements for dispensing generic prescription drugs and/or paid increased fees to PBMs resulting from discount card transactions as a result of transactions with one or more Defendants.

21.      Defendant GoodRx Holdings, Inc. ("GoodRx") is a Delaware corporation with its principal place of business at 2701 Olympic Boulevard, West Building, Suite 200, Santa Monica, CA, 90404. GoodRx transacts business in this District and throughout the United States.

22.     Defendant CVS Caremark Corporation ("CVS Caremark") is a Delaware corporation with its headquarters in Woonsocket, Rhode Island. CVS Caremark is a pharmacy benefit manager and a wholly owned subsidiary of CVS Health Corporation ("CVS Health"). Other subsidiaries of CVS Health include, among others, CVS Pharmacy, CVS Specialty Pharmacy, and Aetna, Inc., the nation's third-largest health insurer. CVS Caremark transacts business in this District and throughout the United States.

23.     Defendant Express Scripts Holding Company ("Express Scripts") is a Delaware corporation with its headquarters in St. Louis, Missouri. Express Scripts is a pharmacy benefit manager and a wholly owned subsidiary of The Cigna Group. Other subsidiaries of the Cigna Group include Cigna Healthcare, the nation's seventh-largest health insurer, and Evernorth Health Services, which operates a mail-order pharmacy, a specialty pharmacy, and a specialty drug distributor. Express Scripts transacts business in this District and throughout the United States.

24.     Defendant MedImpact Healthcare Systems, Inc. ("MedImpact") is a California corporation with its headquarters in San Diego, California. MedImpact is a pharmacy benefit manager and wholly owned subsidiary of MedImpact Holdings, Inc. Other subsidiaries of MedImpact Holdings include, among others, Birdi, Inc. (a mail-order pharmacy) and Specialty by Birdi, a specialty pharmacy. MedImpact transacts business in this District and throughout the United States.

25.     Defendant Navitus Health Solutions, LLC is a Wisconsin corporation with its headquarters in Madison, Wisconsin.  Navitus is a pharmacy benefit manager and is owned jointly by SSM Health, a large healthcare system with locations in several states, and Costco

Wholesale Corporation, the third largest retailer in the world. Costco has over 550 warehouse pharmacy locations in the United States.

## IV.  FACTUAL BACKGROUND

### A.  Background of PBMs

26.     A typical prescription drug transaction in the United States involves at least five and as many as eight different parties, many of which may be invisible to the patient filling a prescription.

27.     The process begins when a doctor writes a prescription for a patient and sends the prescription to the patient's pharmacy. Almost all prescriptions are sent electronically using a special network maintained by a third party that both doctors and pharmacies can access. Once the pharmacy receives a prescription, it submits a claim for the price to be paid by the patient's insurance provider. The claim does not go directly to the insurance company but to the PBM that the insurance company has contracted with to manage its prescription benefits. The PBM pays the pharmacy based on opaque and unpredictable reimbursement calculations based on a number of factors, including contracts between payers (health plans) and the PBMs, between PBMs and pharmacies or Pharmacy Services Administrative Organizations ("PSAOs") which contract with PBMs on behalf of small and mid-sized independent pharmacies, between pharmacies and drug wholesalers or manufacturers, and between health plans and their beneficiaries. The PBM then collects reimbursement from the insurance provider based on a different price list that it has negotiated with that insurance provider.

28.     Figure 1, below, is a diagram depicting the various financial relationships and the flow of prescription drugs and prescription benefit claims between the entities involved in a typical prescription drug transaction.

**Figure 1: Illustration of Typical Prescription Drug Transaction**



29.     PBMs began to appear in the late 1950s in response to demand for management of prescription drug benefits offered by health insurers. In the late 1980s, PBMs began to create more significant "pharmacy benefit" services by developing a system for processing prescription drug claims and reimbursing pharmacies. They now serve as a common intermediary between pharmacies, payers (health insurers, employers, unions, federal and state governments), pharmaceutical manufacturers, and drug wholesalers. PBMs contract with health insurers, drug manufacturers, and pharmacies to provide distribution, reimbursement, and claim-processing services. PBMs negotiate with drug manufacturers to have their drugs included in the PBMs' formularies, and they contract with pharmacies to distribute drugs and services to plan members subject to reimbursement rates and fees negotiated by the PBMs.

**B. Vertical Integration and Consolidation of Market Power by PBMs**

30.    In the 1970s, PBMs began an expansive and ongoing process of horizontal and vertical integration with other entities in the prescription dispensing market. By 2023, the "Big Three" PBMs—Express Scripts, CVS Caremark, and OptumRx— processed nearly 80 percent of the approximately 6.6 billion prescriptions dispensed by U.S. pharmacies.

31.    Additionally, the PBM Defendants are all vertically integrated, meaning they own or are owned by entities that participate at different points in the supply chain for prescription drugs.

32.    As the FTC described in a recent report on PBMs:

All of the top six PBMs [the "Big Six"] are vertically integrated downstream, operating their own mail order and specialty pharmacies, while one PBM [CVS Caremark] owns and operates the largest chain of retail pharmacies in the nation. Pharmacies affiliated with the three largest PBMs now account for nearly 70 percent of all specialty drug revenue. In addition, five of the top six PBMs are now part of corporate healthcare conglomerates that also own and operate some of the nation's largest health insurance companies, including three of the five largest health insurers in the country. Four of the PBMs are owned by publicly traded parent companies that own affiliates that operate health care clinics. Three have recently expanded into the drug private labeling business, partnering with drug manufacturers to distribute drug products under different trade names. Four healthcare conglomerates now account for an extraordinary 22 percent of all national health expenditures, as compared to 14 percent eight years ago.[1]

33.    CVS Caremark provides a fitting example for the market concentration described above. CVS Caremark's parent company, CVS Health Corporation, also owns CVS Pharmacy, CVS Caremark Mail Service Pharmacy, CVS Specialty Pharmacy, Aetna (the nation's third largest health insurance provider), Minute Clinic and Signify Health (health care providers), Cordavis Limited (a drug private labeler), and Zinc Health Services (a group purchasing organization).

---

[1] Fed. Trade Comm'n, *Pharmacy Benefit Managers: The Powerful Middlemen Inflating Drug Costs and Squeezing Main Street Pharmacies*, Interim Staff Report at 2-3 (2024) (internal citations omitted).

34.    Figure 2, below, depicts the corporate families of the Big Six PBMs, demonstrating the high degree of vertical integration (and horizontal concentration) in the industry.

**Figure 2: Vertical Integration of the Big Six**

| Parent/Owner | CVS Health Corporation | The Cigna Group | UnitedHealth Group Inc. | Humana Inc. | MedImpact Holdings Inc. | 19 BlueCross BlueShield plans |
|---|---|---|---|---|---|---|
| Drug Private Labeler | Cordavis Limited | Quallent Pharmaceuticals | NUVAILA | | | |
| Health Care Provider | MinuteClinic, Signify Health | Evernorth Care Group | Optum Health | CenterWell | | |
| Pharmacy Benefit Manager | CVS caremark — 34% | EXPRESS SCRIPTS — 23% | Optum Rx — 22% | Humana Pharmacy Solutions — 7% | MedImpact — 5% | PRIME THERAPEUTICS — 3% |
| "PBM GPO"/ Rebate Aggregator | Zinc Health Services | Ascent Health Services | Emisar Pharma Services | Ascent (via contract) | Prescient Holdings Group LLC | Ascent (minority owner) |
| Pharmacy - Retail | CVS Pharmacy | | | | | |
| Pharmacy - Mail Order | CVS Caremark Mail Service Pharmacy | Express Scripts Pharmacy | Optum Rx Mail Service Pharmacy | CenterWell Pharmacy | Birdi, Inc. | Express Scripts Pharmacy (via contract) |
| Pharmacy - Specialty | CVS Specialty Pharmacy | Accredo | Optum Specialty Pharmacy | CenterWell Specialty Pharmacy | Specialty by Birdi | Accredo (via contract) |
| Health Insurer | Aetna | Cigna Healthcare | UnitedHealthcare | Humana | | 19 BlueCross BlueShield plans |

35.    Decades of intense market consolidation have given the largest PBMs—along with their affiliated insurance carriers and pharmacies—vast market power over independent pharmacies, non-affiliated insurance providers, other market participants, and the customers whose health care they manage.

36.    PBMs do not necessarily make money from regular insurance transactions. In the past, a key source of revenue was "spread pricing," where a PBM charged the insurance company a higher (sometimes much higher) rate for certain drugs than it paid to the pharmacy.

Due to the opacity of PBMs' pricing mechanisms, pharmacies cannot tell where spread pricing occurs. As knowledge of PBM's abusive spread pricing tactics began to seep into public view, PBMs faced an increasing backlash. They have now turned to new sources of revenue which are available only because of their vertical integration and market power.

37.    One large and increasing source of revenue for PBMs is the sale of "specialty drugs," a label applied to high-cost prescription medications used to treat complex, chronic conditions like cancer, rheumatoid arthritis, and multiple sclerosis. Some of these drugs require special handling and administration (e.g., injection or infusion). Over the past decade, revenues from specialty drugs have grown much faster than those from traditional drugs. Between 2016 and 2023, specialty drug revenue increased by over 50 percent, from $113 billion in 2016 to $237 billion in 2023. Estimates of specialty drugs' current share of total pharmaceutical dispensing revenue nationwide range from approximately 40 to over 50 percent.

**Figure 3: Dispensing Revenue of U.S. Pharmacies**
($ in billions)



38.    The increasing prevalence of specialty drugs on the market led to the creation of specialty pharmacies, which dispense only specialty drugs and do so mostly by mail. Each of the

six largest PBMs operates its own affiliated specialty pharmacy, and pharmacies affiliated with the Big 3 PBMs account for over two-thirds of specialty drug dispensing revenue.

39.     Due to the potential for enormously high profits, the majority of new drugs currently being developed and brought to market are intended to be specialty drugs. PBMs take advantage of the high cost of specialty drugs by forcing or incentivizing their plan members to purchase specialty drugs from the PBMs' affiliated specialty pharmacies. PBMs can then charge inflated prices to the specialty pharmacies they own and collect reimbursement for the full price of specialty pharmaceuticals from health plans.

**C.  Prescription Discount Cards**

40.     Recently, PBMs discovered another way to turn their market power into new revenue while simultaneously foreclosing competition: discount card programs. Historically, prescription discount cards have provided an option for people without insurance coverage, or whose insurance did not cover a certain prescription, to obtain affordable medications. PBMs created discount programs and negotiated prices with pharmacies, then worked with marketing companies to promote and advertise the discount cards to patients. Pharmacies chose to honor certain cards as a means of building patient loyalty and increasing traffic to the pharmacy—as customers often buy other items besides their prescriptions—even though they typically lost money on discount card transactions.

41.     Prescription discount cards are not the same thing as the coupons offered by drug manufacturers, although the consumer's experience is largely the same. Manufacturers sometimes provide these coupons for new brand-name medications to reduce the patient's out-of-pocket cost. The patient's insurance is billed in the normal way, but the co-pay is reduced, and the manufacturer reimburses the pharmacy latter for the remainder. Manufacturer coupons are

only available for brand-name drugs, usually for a limited time, and with restrictions on how many times they can be used.

42.     Conversely, the pharmacy does not receive any third-party reimbursement on a discount card transaction and actually sends some of the price it receives from the patient on to the PBM in the form of a fee. Traditionally, pharmacies that have contracted with PBMs to accept various discount cards have done so under the assumptions that: (i) they could be a marketing tool for attracting new customers and (ii) they would be used primarily for the relatively small number of transactions in which the patient's prescription is not covered under an insurance plan, Medicare, or Medicaid.

43.     After the consolidation of market power in the hands of the major PBMs, and with their recognition of these transactions as a significant potential revenue stream, PBMs have made accepting their entire collection of discount cards a condition of the network agreements pharmacies must sign to fill prescriptions covered by the PBMs. To be in-network Pharmacies must generally agree to accept all of a PBM's discount cards, even though they may lose money on a significant proportion those transactions.

**D.  How GoodRx Works**

44.     GoodRx was launched in 2011 as a prescription discount card aggregator. GoodRx analyzes the various discount cards offered by major PBMs and determines the card offering the lowest price to the patient. If that price is lower than the out-of-pocket cost under the patient's insurance, the patient can opt to use the discount card instead. In that case, the patient's insurance is not billed, and the cost is not applied to any deductible or out-of-pocket maximum. While GoodRx markets its offerings as "prescription drug coupons," what it actually provides is access to PBM-administered discount card programs, *not* drug manufacturer coupons.

45.     The core of GoodRx's business is collecting and analyzing PBM pricing data on prescription drugs, for which it utilizes a proprietary "pricing engine." According to the company's most recent Annual Report, GoodRx's "price ingestion technology enables [GoodRx] to link with multiple sources spanning the healthcare industry." In addition, GoodRx has "patented technology related to collecting and normalizing prices from multiple PBMs and presenting them using a single consumer interface."

46.     Consumers can use GoodRx as a tool to pay less for their prescriptions, but until recently, they needed to check GoodRx prices before filling their prescription and present the discount card at the pharmacy. If a consumer chose to use a discount card, the pharmacy would then submit the claim to the PBM offering the discount card, instead of the patient's PBM, which may or may not be the PBM affiliated with the patient's health insurance. For every discount card transaction, the PBM collected a fee from the pharmacy. When a patient used GoodRx to find a discount card, the PBM shared a portion of that fee with GoodRx. GoodRx has reported that it earns about 15 percent of the patient's total retail prescription cost on each transaction. Figure 4, below, is as depiction of GoodRx's business model the company provided in a May 2021 investor presentation.

**Figure 4**



47.    In this type of transaction, there is no health plan or third-party payer reimbursing the pharmacy as in a typical insurance transaction, instead, the patient is the payer and the revenue obtained by the pharmacy, GoodRx, and the PBM all comes out of the retail price the patient pays at the pharmacy. GoodRx, which went public in 2020, has and continues to grow rapidly as more and more consumers realize that discount card prices can be lower than their insurance co-pays.

## V.   ANTICOMPETITIVE CONDUCT

48.    As GoodRx's revenues and presence in the prescription market has grown, the company has sought to expand beyond the basic business model described above. GoodRx's 2023 Annual Report describes its ongoing "growth strategy" of "Pursu[ing] Strategic Partnerships and Acquisitions," including agreements with PBMs and pharmacies to coordinate prices:

We are a valuable partner to a variety of healthcare constituents. We have entered into a number of strategic agreements in recent years. For example, in 2022, we began to enter into direct contractual agreements with select pharmacies to complement the existing contractual agreements with our PBM partners. In addition, starting in 2023, through our partnerships with Express Scripts and CVS Caremark, we commenced operation of our integrated savings programs, which integrates our competitive discounts and pricing in a seamless experience at the pharmacy counter for eligible plan members they serve. Eligible plan members only need to utilize their existing benefit card at their preferred in-network pharmacy to benefit from our discounts and pricing, with no further action required. As part of our business strategy, we will continue to pursue strategic opportunities, including commercial relationships and acquisitions, to strengthen our market position and enhance our capabilities.

49.    The "integrated savings programs" outlined in GoodRx's Annual Report represent a fundamental change in the way discount cards are used and their role in the prescription drug market. As described further below, these partnerships between GoodRx and PBMs amount to a thinly veiled price-fixing conspiracy with the intent and effect reducing and/or foreclosing competition from independent pharmacies by lowering their reimbursements and increasing fees, which serves as the only check on the market power of large PBM-affiliated chains.

**A. The Partnerships between GoodRx and PBMs Facilitate Price Fixing Among the PBM Defendants**

50.    Starting in 2022, GoodRx announced new partnerships with each of the four PBM Defendants, which together "cover over 60% of eligible U.S. lives." The agreements provide "automatic access" to GoodRx's pricing for generic medications. Additionally, the price paid is applied to the patient's deductible or out-of-pocket maximum.

51.    The first "partnership" announced was between GoodRx and Express Scripts. GoodRx announced the agreement during a Q3 2022 Earnings Call that occurred on November 8, 2022. During the call, GoodRx co-founder Trevor Bezdek announced that starting in early 2023, Express Scripts members "will have seamless access to GoodRx prices for eligible generic medication."

52.    In 2023, GoodRx announced three more "partnerships."

53.    First, on July 12, 2023, GoodRx and Caremark announced a new program called "Caremark Cost Saver." Under the program Caremark members "have automatic access to GoodRx's prescription pricing . . . on generic medications." Caremark "members only need to utilize their existing benefit card at their preferred in-network pharmacy. No action is required by the plan member." The program began on January 1, 2024.

54.    Then, on September 13, 2023, GoodRx and MedImpact announced a program where "when an eligible MedImpact member fills a prescription for a generic medication, [GoodRx] will automatically compare their benefit and the GoodRx price." The program began on January 1, 2024.

55.    Finally, on October 12, 2023, GoodRx and Navitus announced a program where GoodRx "provides members with automatic access to GoodRx prices . . . at the pharmacy counter." The program was immediately available to some members, with additional members getting access in January 2024.

56.    The four programs or "partnerships," while separately announced, functioned identically and were entered into by Defendants knowing that their competitors were also entering into them.

57.    The result of these partnerships is a new process that occurs when a customer fills a prescription. Upon receiving a prescription claim for a plan member, instead of reimbursing the pharmacy and passing the claim on to the patient's insurance provider, the patient's PBM uses GoodRx's software to analyze other PBMs' discount programs and determine if any offer a lower price than what the patient would pay out of pocket under their insurance coverage. If so, the patient's PBM redirects the transaction to the PBM offering the discounted price and applies

that price to the patient's deductible. The fee paid by the pharmacy for the discount card

transaction is then split among the patient's PBM, the PBM that processed the transaction, and

GoodRx.

**Figure 5: GoodRx-PBM Partnerships**



58.     The new process, which occurs entirely out of a patient's view, plays out like this:

(i) a pharmacy fills a generic prescription and submits a claim to one of the PBM Defendants; (ii)

the PBM scans GoodRx's data to determine whether any other PBM offers a discount card with a

price lower than the out-of-pocket cost under the patient's insurance; (iii) if a discount card with

a lower price exists, the patient's PBM reroutes the claim through GoodRx to the PBM offering

the lower price; (iv) the patient's PBM applies the lower discount card price to the patient's

insurance deductible; (v) the patient pays the discount card price at the pharmacy counter; (vi)

the pharmacy pays a fee to the discount card PBM; (vii) the discount card PBM sends a portion

of the pharmacy fee to GoodRx; and finally (viii) GoodRx sends a portion of the pharmacy fee to

the patient's PBM.

59.     These partnerships amount to price fixing agreements that enable the PBMs to allocate discount card transactions amongst one another in real time, ensuring the PBMs pay the lowest possible reimbursement rates to pharmacies on every transaction. The partnerships will dramatically increase the portion of prescriptions processed through discount cards, instead of through regular insurance transactions. By targeting generic drugs, Defendants are attacking a stream of revenue on which independent pharmacies depend for most of their survival.

60.     Unlike regular insurance transactions, PBMs keep a portion of the patient's cost at the point-of-sale in the form of a fee collected from pharmacies for each discount card transaction they process. Discount card transactions are therefore more profitable than regular insurance transactions. By sharing pricing data on discount cards and sending prescriptions automatically to the PBM with the lowest pharmacy reimbursement rate—on *every* claim for which a discount card is available from *any* of the participating PBMs at a better price than the patient's insurance—the PBMs ensure that the maximum possible number of prescription drug transactions are funneled through discounts cards (which are more profitable to them) rather than regular insurance transactions, on which pharmacies depend for their revenues.

**B. Harm to Competition**

61.     The brunt of the harm caused by the PBMs' anticompetitive conduct is borne by independent pharmacies which are not affiliated with a major PBM. As the FTC notes in its July 2024 report, PBMs (even those without affiliated retail pharmacies) view independent retail pharmacies as a competitive threat rather than a buyer of PBMs services:

> In addition to increasing their market power from consolidation, leading PBMs have vertically integrated not only with their own retail pharmacies, but also with specialty and mail order pharmacies. This vertical integration may be increasing PBMs' ability and incentive to disadvantage rival, independent pharmacies that directly compete with the PBMs' affiliated pharmacies. One internal PBM document—from a PBM that does not operate a retail pharmacy—makes clear that smaller, unaffiliated pharmacies are viewed as competitors with even the PBMs'

non-retail affiliated pharmacies: "Retailers are our competitors. There is no win-win solution. We are seeking the same Rx. We need the best rates."[2]

62.    To begin with, most independent and small chain pharmacies lack the resources even to understand the complex financial arrangements that determine the reimbursement rate paid to them by PBMs. In a 2016 survey of 600 community pharmacies, for example, two thirds reported having no details on how and when their ultimate reimbursement rate was assessed.[3]

63.    The reimbursement rates pharmacies receive are set by PBMs with their health insurer clients. At the point of sale, the PBM reimburses the pharmacy for its drug ("ingredient") cost, dispensing fee and taxes, and any PBM incentive amounts. For the ingredient cost, the PBM reimburses based on the lesser of  Average Wholesale Price ("AWP"), Wholesale Acquisition Cost ("WAC"), Usual and Customary Price ("U&C"), Submitted Cost, or (5) Maximum Allowable Cost ("MAC").

64.    MAC is the predominant basis for reimbursement for generic drugs. MAC price lists are proprietary price lists created, maintained, and continuously updated (sometimes multiple times a week) by PBMs. MAC prices are confidential and based on a variety of source-pricing indices, including private third-party prices. Every PBM creates and maintains its own set of MAC prices. As the pharmacy provider manual for one large PBM states: "MAC prices are subject to change, which can occur at least on a weekly basis and are based on marketplace trends and dynamics and price fluctuations. MAC price lists and/or pricing formulas are [the PBM's] confidential and proprietary information." When a pharmacy reimbursement is MAC-

---

[2] Fed. Trade Comm'n, *supra* note 1, at 54.

[3] Nat'l Cmty. Pharmacists Ass'n, *Survey of Community Pharmacies: Impact of Direct and Indirect Remuneration (DIR) Fees on Pharmacies and PBM-Imposed Copay Clawback Fees Affecting Patients* (June 2016), https://www.ncpa.co/pdf/dir_fee_pharamcy_survey_june_2016.pdf.

based, the PBM's payment is equal to the MAC price plus the dispensing fee and any PBM incentive amounts.

65.    MAC indices appear to be the basis for pharmacy reimbursement rates in the lion's share of transactions involving generic drugs. A 2020 study of pharmacy claims found that prices were determined by MAC in 82 percent of generic drug transactions, which constituted 80 percent of total prescription drug transactions in that year. This means that for most prescription drug transactions in United States, the PBM's own proprietary, confidential, and constantly changing prices determine the rate at which they reimburse pharmacies.

66.    Independent pharmacies do not know the amount of reimbursement they will receive from PBMs until they run a claim. They therefore lack a crucial piece of information for basic operations and business planning. Pharmacies cannot make informed choices about which PBMs and which networks would pay the best rates, or even which would pay rates that could keep their businesses viable. Adding to the complexity and opacity of reimbursements pharmacies can expect to receive for filling prescriptions, PBMs often make adjustments weeks and months after the date of the transaction, extracting additional fees and clawing back payments from pharmacies.

67.    Independent pharmacies do not have access to the streams of revenue generated from vertical integration and market power on which PBMs and their affiliated pharmacies depend, including (but not limited to) revenue from specialty drugs and fees on discount card transactions. This tilts the playing field in favor of PBM-affiliated pharmacies, who can use their monopoly profits to cover losses on more traditional prescription dispensing services. As the PBMs know, independent pharmacies do not have that luxury. A large and rapidly growing number of independent pharmacies have had to close their businesses as a direct result of PBMs'

anticompetitive conduct, thereby dampening competition and augmenting the market power of vertically integrated PBMs, including the PBM Defendants.

68.     PBMs landed another blow to independent pharmacies through their partnerships with GoodRx. The combination of decreased reimbursements and increased fees paid to PBMs represents a direct transfer of prescription dispensing revenue from independent pharmacies to PBMs and their affiliated pharmacies. In 2023, independent pharmacies went out of business at a rate of approximately ***one per day.*** In a March 2024 survey of 10,000 independent pharmacy owners and managers conducted by the National Community Pharmacists Association, a third of them said they were considering shutting their doors in 2024 due to financial constraints.[4] The pace of closures is likely to quicken as the increase in discount card transactions takes its toll.

69.     These closures are negatively impacting the quality of care patients are receiving. For instance, independent pharmacies are an important source of innovation. Smaller, local pharmacies are more likely to utilize new technology and services that improve patient services. Large pharmacies owned by healthcare conglomerates face significant challenges in introducing new technologies, practices, or services due to their size and bureaucratic nature. Implementing new technologies across hundreds or thousands of pharmacies, for example, can be a daunting task, requiring a significant investment in time and resources. In contrast, local pharmacies have fewer stores and can implement new technologies more quickly and efficiently.

70.     Additionally, independent pharmacies are more likely to be fully integrated into the community and tend to maintain closer relationships with customers whose prescriptions require special administration, whose conditions may make it difficult to manage their

---

[4] *See* Maia Anderson, *Nearly a third of independent pharmacies at risk of closure in 2024*, Healthcare Brew (March 25, 2024), https://www.healthcare-brew.com/stories/2024/03/25/nearly-a-third-of-independent-pharmacies-at-risk-of-closure-in-2024.

prescriptions, or who would benefit from other individualized care. In rural and underserved areas, which large chain pharmacies avoid because they are less profitable, independent community pharmacies may be the core of an individual's healthcare support system. They may also be rural patients' only option for filling prescriptions. The ability of independent pharmacies to provide individualized, flexible, and non-traditional care to their customers was a key advantage they used to compete with larger chains. This arena of competition has been largely eliminated by the anticompetitive conduct described herein.

## VI.   RELEVANT MARKET AND MARKET POWER

71.    The relevant market in this case is the market for pharmacy reimbursements for prescription drug dispensing services in the United States (the "Relevant Market").

72.    The anticompetitive effects described above, including the suppression of reimbursements from PBMs to pharmacies, provides sufficient evidence that Defendants possessed market power in the relevant market.

73.    The Big 3 PBMs, of which 2 are PBM Defendants, process nearly 80 percent of prescription drug claims in the United States, up from 70 percent in 2016. The Big 6, of which 3 are PBM Defendants, process more than 90 percent of claims. The PBM Defendants specifically cover over 60% of eligible U.S. lives.

74.    Each of the PBM Defendants is a wholly owned subsidiary of a healthcare conglomerate that also owns mail-order, specialty, and retail pharmacies, large health insurance companies, and/or other players in the market for prescription dispensing services. *See* Figure 2, *supra*, at 12.

75.    The relevant geographic market in this case is the United States. The United States healthcare industry, including the market for pharmacy reimbursements, is subject to a variety of unique federal and state laws and regulations that apply only in the United States. The

relevant geographic market is not smaller than the United States because pharmacies are reimbursed by PBMs operating nationwide.

76.    Defendants, collectively and individually, possess market power that is more than sufficient to cause harm to competition in the Relevant Market

## VII.  CLASS ACTION ALLEGATIONS

77.    Plaintiffs bring this action on behalf of themselves and all others similarly situated as a class action under Federal Rules of Civil Procedure 23(a) and 23(b)(3), seeking damages, as well as equitable and injunctive relief, on behalf of the following Class:

> All pharmacies in the United States who dispensed generic pharmaceuticals to (a) Express Scripts members from January 1, 2023 to the present, or (b) to Caremark, MedImpact, or Navitus members from January 1, 2024 ((a) and (b) together are the "Relevant Periods").

78.    The following persons and entities are excluded from the above-described proposed Class:

(a)    All pharmacies owned by, operated by, or affiliated with a PBM, including the PBM Defendants;

(b)    Defendants and their counsel, officers, directors, management, employees, subsidiaries, or affiliates;

(c)    All governmental entities;

(d)    All Counsel of Record; and

(e)    The Court, Court personnel, and any member of their immediate families.

79.    The Class is so numerous as to make joinder impracticable. Plaintiffs do not know the exact number of Class members because such information is presently in the exclusive control of Defendants. Plaintiffs believe that there are likely, at a minimum, thousands of Class members in the United States and its territories.

80.    Common questions of law and fact exist as to all members of the Class. Plaintiffs and the Class were injured by the same unlawful schemes, Defendants' anticompetitive conduct was generally applicable to all the members of the Class, and relief to the Class as a whole is appropriate. Common issues of fact and law include, but are not limited to, the following:

(a)    Whether Defendants engaged in anticompetitive acts aimed at unreasonably restraining competition in the Relevant Market;

(b)    Whether such acts violated federal antitrust laws;

(c)    Whether the Defendants' conduct caused injury to Plaintiffs and the other members of the class;

(d)    Whether Defendants caused Plaintiffs and the members of the Class to suffer damages in the form of under-reimbursements for the dispensing of generic drugs;

(e)    The appropriate class-wide measure of damages; and

(f)    The nature of appropriate injunctive relief to restore competition in the Relevant Market.

81.    Plaintiffs' claims are typical of the claims of Class members, and Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs and all members of the Class are similarly affected by Defendants' unlawful conduct in that they received lower reimbursements for generic drugs as they would have absent the conduct.

82.    Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other members of the Class. Plaintiffs' interests are coincident with and typical of, and not antagonistic to, those of the other members of the Class.

83.    Plaintiffs have retained counsel with substantial experience litigating complex antitrust class actions in myriad industries, including in the pharmaceutical industry, and in courts throughout the nation.

84.    The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including issues relating to liability and damages.

85.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons or entities to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action. Moreover, the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

86.    Plaintiffs knows of no difficulty likely to be encountered in the maintenance of this action as a class action under Federal Rule of Civil Procedure 23.

## VIII.  ANTITRUST INJURY

87.    Defendants' anticompetitive conduct causes Plaintiffs and the Class to suffer antitrust injury in the form of:

(a)  Decreased reimbursements for dispensing generic prescription drugs;

(b)  Increased fees to PBMs resulting from discount card transactions; and

(c)  Reduced competition in the Relevant Market.

88.    This is an injury of the type that the antitrust laws were meant to punish and prevent.

## IX.  CLAIMS FOR RELIEF

## COUNT 1

### Price Fixing in Violation of Section 1 of the |
### Sherman Act (15 U.S.C. § 1)

89.    Plaintiffs repeats the allegations set forth above as if fully set forth herein.

90.    During the Relevant Periods, Defendants and their co-conspirators entered into and engaged in a contract, combination, or conspiracy to unreasonably restrain trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

91.    The contract, combination, or conspiracy consisted of an agreement among Defendants and their co-conspirators to fix, raise, stabilize, or maintain reimbursements for dispensing prescription drugs charged to Plaintiffs and members of the Class at artificially low levels.

92.    Plaintiffs and members of the Class have been injured and will continue to be injured in the form of under-reimbursement for prescription drugs.

93.    Defendants' anticompetitive conduct had the following effects, among others:

(a)  The reimbursements paid to Plaintiffs and Class for prescription pharmaceuticals has been fixed, stabilized, or maintained at artificially low levels;

(b)  Plaintiffs and the Class have paid increased fees to PBMs; and

(c)  Plaintiffs and Class members have been deprived of the benefits of free and open competition between and among Defendants.

94.    This conduct is unlawful under the *per se* standard. Or, in the alternative, Defendants' conduct is unlawful under the rule of reason or "quick look" standards.

95.    Defendants' conduct lacks a non-pretextual procompetitive justification that offsets the harm caused by Defendant's anticompetitive and unlawful conduct. Moreover, even if there were valid procompetitive justifications, such justifications could have been reasonably achieved through means less restrictive of competition.

96.    Plaintiffs and members of the Class are entitled to treble damages, attorneys' fees and costs, and an injunction against Defendants to end the ongoing violations alleged herein.

## COUNT 2

**Agreements to Unreasonably Restrain Trade
In Violation of Section 1 of the |Sherman Act (15 U.S.C. § 1)**

97.    Plaintiffs repeat the allegations set forth above as if fully set forth herein.

98.    In the alternative to Count 1, during the Relevant Periods, GoodRx and each of the PBM Defendants entered into and engaged in a contract, combination, or conspiracy to unreasonably restrain trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

99.    Collectively, the PBM Defendants have market in power in the Relevant Market.

100.    GoodRx and each of the PBM Defendants has entered into anticompetitive agreements that harmed competition in the Relevant Market by suppressing reimbursements to pharmacies, including Plaintiffs and members of the Class.

101.    The agreements between GoodRx and the PBM Defendants are each an unreasonable restraint of trade in violation of Section 1 of the Sherman Act. GoodRx and the PBM Defendants entered into agreements that used their combined market power to restrain trade in the Relevant Market.

102.    Defendants' conduct lacks a non-pretextual procompetitive justification that offsets the harm caused by Defendant's anticompetitive and unlawful conduct. Moreover, even if

there were valid procompetitive justifications, such justifications could have been reasonably achieved through means less restrictive of competition.

103.    Plaintiffs and members of the Class are entitled to treble damages, attorneys' fees and costs, and an injunction against Defendants to end the ongoing violations alleged herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class of all others so similarly situated, respectfully request that this Court:

A.    Determine that this action may be maintained as a class action under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiffs as Class Representative and their counsel of record as Lead Class Counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class, once certified;

B.    Adjudge and decree that Defendants have entered into a contract, combination, or conspiracy to fix, raise, stabilize, or maintain reimbursements charged to Plaintiffs and members of the Class for prescription drugs at artificially low levels in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

C.    Enjoin Defendants from continuing to engage in anticompetitive practices described herein and from engaging in other practices with the same purpose and effect as the challenged practices;

D.    Enter judgment against Defendants, jointly and severally, and in favor of Plaintiffs and members of the Class for treble the amount of damages sustained by Plaintiffs and the Class as allowed by law, together with costs of the action, including reasonable attorneys' fees, pre- and post-judgment interest at the

highest legal rate from and after the date of service of this complaint to the extent

provided by law; and

E.   Award Plaintiffs and members of the Class such other and further relief as the

case may require and the Court may deem just and proper under the

circumstances.

**JURY TRIAL DEMANDED**

Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil

Procedure, of all issues so triable.

Dated: November 1, 2024                     Respectfully submitted,


*/s/ Stephen M. Prignano*

Stephen M. Prignano   (3649)
**MCINTYRE TATE LLP**
50 Park Row West Suite 109
Providence, RI 02903
(401) 351-7700
sprignano@mcintyretate.com

Gregory S. Asciolla (*pro hac vice* forthcoming)
Alexander E. Barnett (*pro hac vice* forthcoming)
Geralyn J. Trujillo (*pro hac vice* forthcoming)
Jonathan S. Crevier (*pro hac vice* forthcoming)
John M. Shaw (*pro hac vice* forthcoming)
**DICELLO LEVITT LLP**
485 Lexington Avenue, Suite 1001
New York, New York 10017
(646) 933-1000
gasciolla@dicellolevitt.com
abarnett@dicellolevitt.com
gtrujillo@dicellolevitt.com
jcrevier@dicellolevitt.com
jshaw@dicellolevitt.com

Joshua H. Grabar  (*pro hac vice* forthcoming)
**GRABAR LAW OFFICE**
One Liberty Place

1650 Market Street, Suite 3600
Philadelphia, Pennsylvania 19103
(267) 507-6085
jgrabar@grabarlaw.com

*Counsel for Plaintiffs and the
Proposed Class*